**DYOTHERM CORPORATION**
v.
**TURBO MACHINE COMPANY.**
**Civ. A. No. 31984.**

United States District Court
E. D. Pennsylvania.
April 20, 1964.

Schiff, Cummis & Kent, Newark, N. J., John B. Brumbelow, Philadelphia, Pa., for plaintiff.

Paul & Paul, Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

This matter is before the Court on cross motions for summary judgment on the first and second counts of plaintiff's Complaint, and on defendant's motion to dismiss the third count for failure to state a cause of action.

### I.

The first two counts allege defendant's breach of a tripartite agreement entered into on July 25, 1957, by Dyotherm Corporation, Turbo Machine Company, and Messrs. Grant H. and Harry E. Brewin.

The agreement is in settlement of a suit initiated by Dyotherm against Turbo. Civil No. 22,232, E.D.Pa., March 13, 1957. It provides, *inter alia*:

"2. The parties agree to the dismissal with prejudice of the complaint and counterclaim in the above action * * *.

"3. DYOTHERM hereby grants to the BREWINS, their heirs,

executors or administrators, the following rights for North and South America and Japan, *and nowhere else*, pertaining to the subject matter of the following United States patent applications * * *." (Emphasis added.)

Particular rights to manufacture and sell are then set forth. Paragraph 3(d) states: "All of the said licenses to the BREWINS include the right to grant sublicenses."

Paragraph 8 reads:

"The BREWINS shall relicense the rights for which they are licensed under the terms of this agreement to TURBO for a consideration to be agreed upon by the BREWINS and TURBO * * *."

Plaintiff alleges in count one that defendant has manufactured and sold certain machines covered by the agreement in areas throughout the world other than North and South America and Japan.

The parties in this cause have stipulated that plaintiff's right to recover on the first count will be determined solely on the following issue:

"[W]hether the settlement agreement of July 25, 1957, together with the accompanying relicense agreement extending from the Brewins to Turbo:

"(a) As plaintiff contends, forbids Turbo from manufacturing its accused dye boarder within or without the United States of America for sale outside of North America, South America or Japan, or

"(b) As defendant contends, does not so forbid Turbo but limits the license granted so that any manufacture of its accused dye boarder for sale outside North America, South America or Japan is unlicensed."

The focus of the controversy is on the interpretation of the phrase "and nowhere else" in paragraph 3 of the 1957 agreement, supra.

Plaintiff, in offering its interpretation, relies on "the atmosphere within which the settlement of the first suit was conducted."[1] Defendant counters that "the language 'and nowhere else' is commonly used in patent licenses to set a geographical limitation upon the scope of the license."[2] Neither the "atmosphere" of the negotiations nor the usage of certain words in the patent field has been established by proper evidence thus far.

The next major area of contention is the meaning of the deposition testimony of Ludwig Schierenbeck, Turbo's President.

(P. 18):

"BY MR. SCHIFF:

"Q. * * * Was your understanding * * * that under paragraph 3, [1957 agreement], if you had any machine which did not contain any of the patented Dyotherm patents, you were free to use this any place without the benefit of any license?

"A. That's right.

"Q. Now, you also indicated that you were granted a license on the Turbo machine for certain countries under this paragraph 3.

"A. If we used the Dyotherm Patent. * * *

(P. 21):

"Q. Now, is it your understanding, or was it your understanding at the time you entered into this agreement, that the Brewins would be prohibited from manufacturing for sale outside of North America, South America, or Japan any machine which was described in paragraph (a), (b), or (c)?

"A. Yes, because that machine involved the use of Dyotherm patents * * *."

Plaintiff contends that the clear import of this testimony is,

"that under Turbo's sub-license it was restricted to the same territorial limitations as were the Brewins under their principal license, and it is further clear that Mr. Schierenbeck understood that the Brewins under the license agreement, were prohibited from manufacturing the machine for sale outside of North America, South America, and Japan."[3]

Defendant retorts that:

"The business understanding of the President of defendant clearly is the Brewins, who were licensed by plaintiff, would be prohibited from manufacturing for sale outside the licensed territory, *not because of their agreement, but because of Dyotherm's patents.* * * * * Mr. Schierenbeck said that the *prohibition would arise from the patents,* and not from the agreement."[4]

It is not clear whether Mr. Schierenbeck's answers are based on his understanding of paragraph 3 of the agreement, or on his respect for the patent laws. The latter possibility and the existence of a limited license are not mutually exclusive. On the other hand, his answers can be the offspring of both an appreciation of the patent laws and his understanding of paragraph 3. From this speculation it is evident that the foregoing presents sharply disputed issues of fact.

Count two, sounding in unfair competition, is founded on plaintiff's interpretation of paragraph 3 of the 1957 agreement, and therefore hinges on the merits of count one.

■ In seeking summary judgment both parties assert that "there is no genuine issue as to any material fact." Rule 56(c), Fed.R.Civ.P. The evidentiary matter in support of the cross motions in this action presents a genuine need for trial to elucidate controverted factual issues. Therefore, both motions for summary judgment on counts one and two are denied.[5]

1. Pl. Brief, p. 4.

2. Deft. Brief, p. 6.

3. Pl. Supp. Brief, p. 7.

4. Deft. Reply Brief, pp. 3, 4.

5. Lynn v. Smith, 281 F.2d 501, 506 (3rd Cir. 1960); Dietrich v. Standard Brands,

## II.

Defendant seeks dismissal of the third count of the Complaint for failure to state a cause of action. Plaintiff urges, and defendant concedes, for the purpose of this motion, that English law is applicable.[6]

### "THIRD COUNT

"2. As part of its scheme to destroy plaintiff's business and to pirate plaintiff's property rights, defendant knowing of plaintiff's agreement with the Sanderson Company of England, in September, 1957, through one of its officers Dexter Schierenbeck, traveled to England and met with Mr. C. R. Holroyd and officers of Sanderson & Co. On behalf of defendant, he disparaged plaintiff's patents, plaintiff's machine and plaintiff's business ability and plaintiff's ability to manufacture its machine competently, and wilfully, maliciously and with intent to harm plaintiff's business and destroy its property rights, attempted to persuade the Sanderson Company to break its contractual relationship with plaintiff and to establish contractual relations with the defendant."

This count sets forth a mélange of possible business torts bottomed on one set of circumstances. Both plaintiff and defendant only deal with one possibility in their briefs—the tort of inducing a breach of contract. Nevertheless, as defendant urges dismissal of the third count for failure to state a cause of action, it is to this count as stated in the complaint that attention must be given rather than to the limited area disputed by both parties.

■ Defendant's alleged activities readily suggest a cause of action for slander *per se* of the Dyotherm Cor-

poration. English law does not require allegation of a breach of contract, actual interference, or specific injury to make out this cause of action.

"A company can * * * maintain an action for a defamatory statement made of it in respect of its business. * * * A trading corporation or company has a trading character and can maintain an action for libel or slander, without proof of special damage, in respect of statements reflecting on it in the way of its trade or business and calculated to injure it therein. * * * *"[7]

The cases agree. As to libel, South Hetton Coal Co. v. North Eastern News Association, [1894] 1 Q.B. 133 (C.A.), per Lord Esher, M.R.; as to slander, D. and L. Caterers, Ltd., and Jackson v. d'Anjou, [1945] 1 K.B. 364 (C.A.), [1945], 1 All E.R. 563.

Lord Esher, M.R. in the South Hetton Coal Co. case, supra, at 139, sheds light on the standard for evaluating a statement as a libel:

"Statements may be made with regard to their [firm's or company's] mode of carrying on business, such as to lead people of ordinary sense to the opinion that they conduct their business badly and inefficiently. If so, the law will be the same in their case as in that of an individual, and the statement will be libellous. * * * *"

■ Neither counsel has filed an exhaustive analysis of relevant English law, and they fail to discuss in any respect the slander aspects of English law which could be encompassed in count three. Through independent research, I am persuaded that in the present posture of this case the third count should not be dismissed for insufficiency, since it does not appear "to a certainty that

---

Inc., 32 F.R.D. 325 (E.D.Pa.1963); Hahn v. Woodlyn Fire Co. No. 1, 32 F. R.D. 429 (E.D.Pa.1963).

**6.** This leaves unanswered the important choice of law question involved in this

type of tort. See 2 Harper & James, Torts, § 30.7 (1956).

**7.** 24 Halsbury, Laws of England, § 25, p. 13 (3rd ed. 1958).

the plaintiff would not be entitled to relief under any state of facts which could be proved in support of the claim."[8]

However, at trial, the parties will not be precluded from filing additional memoranda on the English law relevant to the facts then proven or relied on.

Defendant's motion to dismiss is denied.

8. Hughes v. Local 11, Int'l Ass'n of Structural & Ornamental Iron Workers, AFL-CIO, 287 F.2d 810, 814 (3rd Cir. 1961), cert. denied, 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961); see Fed.R.Civ.P. 12(b) (6); 2 Moore, Federal Practice § 12.08 (2d ed. 1962); see Arfons v. E. I. DuPont deNemours & Co., 261 F.2d 434 (2d Cir. 1958) reversing dismissal of a complaint "where it was conceivable that plaintiff *might* be able to establish that the Connecticut choice of law rule would require the court to look to the law of

Ohio which *might* permit a recovery * * *." (Emphasis added.)